# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 19-cr-185(2) (SRN/KMM) |
| Plaintiff, | |
| v. | **ORDER** |
| William Charles Graham (2), | |
| Defendant. | |

Amber Brennan, Justin Wesley, and Nathan Nelson, United States Attorney's Office, 600 U.S. Courthouse, 300 S. 4th St., Minneapolis, MN 55415, for the Government

William Charles Graham, Reg. No. 22097-041, Sherburne County Jail, 13880 Business Center Dr. NW, Elk River, MN 55330, Pro Se Defendant

Andrew Mohring, Office of the Federal Defender, 300 S. 4th St., 107 U.S. Courthouse, Minneapolis, MN 55415, Standby Counsel for Defendant

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Defendant William Charles Graham's Motion for Reconsideration of Detention Denial/Release ("Motion for Release") [Doc. No. 166]. Also before the Court are several letter requests or motions filed by Graham [Doc. Nos. 133, 158, 161, 167, 170], in which he seeks similar or additional relief. The Government filed a response in opposition to Graham's Motion for Release, (Gov't's Opp'n [Doc. No. 174]), to which Graham filed a reply, (Reply [Doc. No. 178].) Based on a review of the file,

record, and proceedings herein, and for the following reasons, the Court denies the Motion

for Release, and denies as moot Graham's other letter requests or motions for relief.

## I.    BACKGROUND

### A.  Procedural and Factual Background

On July 16, 2019, the Government charged Graham and co-defendant Ronald

Jackson with interference with commerce by robbery in violation of 18 U.S.C. §

1951(b)(1), (Indictment [Doc. No. 1]), Count 1), and using, carrying, and brandishing a

firearm during and in relation to a crime of violence in violation of 18 U.S.C. §

924(c)(1)(A)(ii). (*Id.*, Count 1.) The Government contends that Graham faces a mandatory

minimum sentence of 84 months on Count 2, consecutive to any sentence that may be

imposed on Count 1. (Gov't Opp'n at 3.) In addition, the Government believes that

Graham qualifies as a Career Offender under the U.S. Sentencing Guidelines, and, if

convicted of both counts at trial, faces a Guidelines range of 30 years to life imprisonment.

(*Id.*) (citing U.S.S.G. § 4B1.1(c)(3)).

At the July 23, 2019 hearing on the Government's motion for pretrial detention, the

Court ordered that Graham be detained. (Order of Detention [Doc. No. 28] at 3–4.) At the

hearing, ATF Special Agent David Carriker offered testimony. (July 23, 2019 Court

Minutes [Doc. No. 24].) In the Order of Detention, Magistrate Judge Steven Rau made the

following findings regarding the charges in this case:

> The alleged offense in this case is a Hobbs Act Robbery of a T-Mobile Store
> in Brooklyn Park, Minnesota, on April 30, 2019. Special Agent Carriker
> testified that two men entered the store brandishing what appeared to be
> firearms. They forced the two store employees to the back of the store,
> zip tied them, and fled the store with over 70 cell phones. One of the

cell phones had a tracking device installed, and within minutes the Brooklyn Park Police Department had located the phones in the parking lot of a Fleet Farm, near the T-Mobile store. When officers arrived at the Fleet Farm, they passed a Kia that was parked, with the engine running, and observed a man who appeared to be crouched down, attempting to avoid being seen. After officers passed the Kia, they observed them both. The men were Graham and Jackson. Inside the Kia, officers recovered, among other things, the stolen cell phones, Graham's driver's license, and the disguises the two robbers had been wearing in the store (fake dreadlocks, reflector vests, and dust masks). They also recovered two firearms from the car – one was a BB gun, and the other was a .380 caliber semi-automatic pistol. After reviewing some of the surveillance from the T-Mobile store, Special Agent Carriker believes Jackson was holding the .380 and Graham was holding the BB gun.

(Order of Detention at 2–3.)

Magistrate Judge Rau also noted that U.S. Pretrial Services had prepared a bond report containing Graham's criminal history and a recommendation for detention. (*Id.* at 1–2.) In the Order of Detention, the magistrate judge noted in particular Graham's prior convictions for aggravated robbery and kidnapping in 2014, and kidnapping in 2015, both of which targeted cell phone businesses. (*Id.*) In the 2014 case, which Magistrate Judge Rau found "similar to this case," Graham was convicted of robbing a T-Mobile store in Minneapolis in May 2013 by threatening to harm the employee and his family if he failed to comply with Graham's demands for cell phones. (*Id.* at 2.) Graham then locked the employee in an inventory cage and fled with 83 cell phones valued at $64,000. (*Id.*) He was sentenced to 58 months in prison on November 1, 2017, and remained on supervised release until November 2019. (*Id.*)

The 2015 conviction, which involved the same codefendant as in this case, Ronald Jermaine Jackson, arose from the kidnapping of a Verizon employee near the employee's

home.  (*Id.*)  Graham and Jackson forced the employee into the trunk of the car they were driving, zip tied him, drove around, attempted to extract the keys to the Verizon store from the victim, and eventually parked near the victim's residence, leaving him in the trunk. (*Id.*)  For this offense, Graham was sentenced to 74 months in prison.  (*Id.*)

In ordering Graham's detention, Magistrate Judge Rau found that in light of the nature of the instant charges, Graham's previous kidnapping and aggravated robbery offenses, as well as the Pretrial Services report, Graham had failed to rebut the presumption of detention under 18 U.S.C. § 3142(e).  (*Id.* at 3.)  Moreover, even if Graham had rebutted the presumption, the magistrate judge found that no condition or combination of conditions would assure the safety of the community if Graham were released, and Graham presented a flight risk if he were released.  (*Id.*)

### B.  Parties' Arguments and Evidence

Graham remains in detention in the Sherburne County Jail ("the Jail") pending trial. Given the COVID-19 pandemic, he seeks release pending sentencing.  (Def.'s Mot. at 1–2.)  Graham argues that the Eighth Amendment's proscription against cruel and unusual punishment warrants his release.  (*Id.* at 1.)  He also invokes the Fifth and Fourteenth Amendments, but provides no information as to their applicability.  (*Id.* at 2) ("It is one's request that one's Constitutional Rights being violated discontinues and that this Court grants such request of release effective immediately.  This request is supported by one's [F]ifth and [F]ourteenth Amendment [r]ights.").  In addition to the instant motion seeking release, the Court addresses several other letter requests or motions for relief following its discussion of the instant motion.

The Government opposes Defendant's motion. (Gov't's Opp'n at 1.) It asserts that the Court could simply deny it as moot due to an outstanding Minnesota Department of Corrections hold currently in place based on Graham's state court detainers arising from underlying state court convictions. (*Id.*) However, the Government asks the Court to deny Graham's request on the merits. (*Id.*) The Government observes that Graham does not directly challenge the Court's prior findings that no conditions of release would assure the safety of the community and Defendant's appearance at future proceedings, but instead seeks release based on the COVID-19 pandemic. (*Id.* at 2.) The Government contends that the COVID-19 pandemic is not a valid basis for such relief, and granting Defendant's release would "ignore[] the demonstrated capabilities of the Sherburne County Jail to meet this challenge." (*Id.*)

In response to Defendant's concerns about COVID-19 and the safety of conditions in the Jail, the Government submits the Affidavit of Brian Frank (the "Frank Aff." [Doc. No. 174-1]). Mr. Frank is the Jail Administrator of the Sherburne County Jail, and supervises the operations of the facility. In his affidavit, Frank details the general background, structural safety, operational safety, and medical safety of the Jail, as well as the efforts taken to facilitate detainees' ability to consult with counsel. Frank notes that at present, there are no known cases of COVID-19 in the Jail. (Frank Aff. ¶ 3.) In light of the pandemic, the Jail has "proactively modified its already stringent safety and cleaning measures," by placing new inmates in a 14-day quarantine that is isolated from the general population and monitored by licensed medical professionals. (*Id.*) Any inmates reporting illness are seen by a licensed medical provider who performs a general medical assessment

and administers a Coronavirus Screening Checklist. (*Id.*, Ex. 1 (Coronavirus Checklist).) Frank states that if an inmate presents confirmed symptoms of illness, staff will place the inmate into medical isolation. (Frank Aff. ¶ 3.) Moreover, the Jail has reduced its staffing to only "essential employees," who are screened daily, including a body-temperature check, prior to entering the facility. (*Id.*)

In terms of the Jail's structural safety, Frank states that it is designed to contain an airborne threat and prevent it from spreading throughout the facility. (*Id.* ¶ 6.) If necessary, the Jail can isolate into 12 distinct sectors or "smoke zones." (*Id.*) To do so, the Jail's nine separate air exchange units can be calibrated to bring in a certain percentage of fresh air, while exhausting the same amount of air from inside the Jail. (*Id.*) The return air passes through a MERV-8 filter before entering the Jail. (*Id.*) Within a given zone, this ventilation system is able to recycle up to 100% of the air with fresh air. (*Id.*) The Jail can control the percentage variable, which is typically set at approximately 20%. (*Id.*) In light of COVID-19 safety measures, the Jail has adjusted the value for all zones to 80%. (*Id.*) Because of the Jail's understanding that the virus is transmitted primarily through water particles, it believes that "this ventilation system is imperative to minimizing potential exposure within the Jail community." (*Id.*) The Jail monitors the ventilation settings in all zones and will adjust them as necessary. (*Id.*)

Frank observes that the Jail has 24 units designated to quarantine new arrivals to the facility. (*Id.* ¶ 7.) New inmates are housed in these dedicated units for 14 days. (*Id.*) During this period of isolation, licensed medical providers monitor and screen the new

inmates for any signs or symptoms of illness. (*Id.*) If an inmate displays such signs of illness, licensed medical providers examine and treat the inmate accordingly. (*Id.*)

In addition, Frank states that the Jail has a separate space for inmates who are diagnosed with an illness by a medical professional, and the space is separate from the quarantine units for new arrivals. (*Id.* ¶ 8.) Only after a medical professional deems it safe for the inmate to return to the general population does an inmate return. (*Id.*)

Frank further states that the Jail has contingency plans in the event that COVID-19 is present in the Jail. (*Id.* ¶ 9.) Under this plan to isolate and control any such outbreak, the Jail will designate entire areas for isolated housing, or establish a special housing unit for inmates who test positive for the virus. (*Id.*) The Jail also has three negative-pressure units in which it could treat severely symptomatic inmates. (*Id.*) Such units are mechanically ventilated to generate negative pressure and prevent contaminated air from escaping. (*Id.*)

As to the Jail's operational safety, Frank states that staff constantly monitor the COVID-19 pandemic and modify procedures accordingly. (*Id.* ¶ 10.) The Jail reviews daily updates from the Center for Disease Control and Prevention ("CDC") and implements guidance specifically tailored to a correctional facility environment. (*Id.*) In addition, three days a week, the Jail participates in a teleconference with the Minnesota Department of Corrections to discuss COVID-19 and best practices to ensure inmate safety. (*Id.*) Frank also asserts that the Jail "maintains rigorous and routine cleaning, sanitation, and hygiene procedures." (*Id.* ¶ 11.) The Jail cleans all frequently-touched surfaces in housing units four times daily with a virus-killing chemical, and additionally cleans housing units before

every meal and the nightly lockdown. (*Id.*) Hallways are cleaned and disinfected three times daily and floors are cleaned once a day. (*Id.*) Further, the Jail ordered 250 gallons of sanitizing cleaner that it expected to receive by March 27. (*Id.*) Finally, Jail staff have shared CDC guidance on proper handwashing techniques and social distancing with inmates. (*Id.* ⁋ 12.) Jail staff monitor and enforce this guidance as necessary. (*Id.*)

Frank also asserts that medical staff facilitate and monitor the 14-day quarantine of new arrivals at the Jail. (*Id.* ⁋ 14.) Staff administer the Coronavirus Screening Checklist and continue to monitor new arrivals throughout the 14-day quarantine period, including by monitoring body temperature on a daily basis. (*Id.*) Only after a new arrival completes the 14-day quarantine is he or she allowed to enter the general population. (*Id.*) The Jail's medical staff likewise monitor any inmates in the general population who complain of illness or exhibit symptoms. (*Id.* ⁋ 15.) Staff administer the Coronavirus Screening Checklist, complete medical assessments, and provide any necessary care. (*Id.*) Care may include a protective surgical mask, routine care, or placement in isolation. (*Id.*)

As to the Jail's staffing complement, Frank states that currently, only essential employees are working at the facility in order to limit the potential exposure to illness within the Jail. (*Id.* ⁋ 16.) Supervisory staff actively monitor essential staff members, who are screened every time they enter the Jail with a body-temperature check and the Coronavirus Screening Checklist. (*Id.* ) If an employee shows any symptoms of illness, the employee is denied admission onto the premises. (*Id.*)

In addition, regarding the ability of inmates to consult with defense counsel, Frank states that while concerns about COVID-19 have caused the Jail to temporarily discontinue

contact visits, inmates retain the ability to consult with defense counsel.  (*Id.* ⁋ 17.)  All inmates and counsel may use video visitation in the common areas of the housing unit, which is neither recorded nor expressly monitored.  (*Id.* ⁋ 18.)  In limited circumstances, the Jail may be able to accommodate a request for greater privacy, but hopes that such accommodations are unnecessary, in light of other opportunities for interactions between inmates and defense counsel.  (*Id.*)  With prior Court approval, the Jail also facilitates video teleconferencing for inmates to appear for court appearances.  (*Id.* ⁋ 19.)   The Jail also is committed to facilitating interactions between inmates and defense counsel before, during, and after court appearances.  (*Id.*)

## II.    DISCUSSION

### A.  Motion for Release

When making a detention determination under 18 U.S.C. § 3142, courts consider: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger to any person or to the community, and the risk of flight, which the defendant's release would pose.  18 U.S.C. 3142(g).  As noted earlier, because Graham is charged with brandishing a firearm in further of a crime of violence, in violation of 18 U.S.C. § 924(c), there is a rebuttable presumption in favor of detention.   18 U.S.C. § 3142(e)(3)(B).  Further, as the Government notes, at least one state court detainer remains active against Graham.  (*See* Gov't's Opp'n at 1.)

Graham contends that the COVID-19 pandemic presents a change in circumstance that warrants his release.  (Def.'s Mot. at 1–2; Reply at 4–5.)  In addition, he argues in his

Reply that: (1) "detention prior to trial or without trial is prohibited by the [E]ighth and [T]hirteenth [A]mendments," (Reply at 4); (2) former counsel's entry of a not-guilty plea on Graham's behalf "allow[ed]" the magistrate judge to detain him, (*id.* at 1); and (3) he has been denied access to a hearing. (*Id.* at 2.)

Graham's claim that the Eighth and Thirteenth Amendments prohibit detention prior to trial is entirely without merit, as is his contention that because Mr. Mohring entered a not-guilty plea on his behalf, Graham was subject to detention. The authority and procedures for detention of a defendant pending trial are found in federal law. *See* 18 U.S.C. § 3142 (authorizing and proscribing the process for release or detention of a defendant pending trial). Mr. Mohring's actions in entering a not-guilty plea had no effect on detention.

As to whether the COVID-19 pandemic presents a change in circumstance that supports reopening the detention hearing under 18 U.S.C. § 3142(f), or an "exceptional reason" making Graham's continued detention inappropriate under 18 U.S.C. § 3145(c), the Court finds that it does not. Under § 3142(f), a detention hearing may be reopened if the Court determines that there is information, unknown to the movant at the time of the prior hearing, that has a "material bearing" on the issue of whether there are conditions of release that will assure the defendant's appearance in court and the safety of the community. Under § 3145(c), a defendant may be ordered released "if it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate." Also, while the Court notes that a defendant may obtain temporary release when "necessary for preparation of the person's defense or for another "compelling reason," 18 U.S.C. §

3142(i), Graham seeks indefinite release on bond and fails to present a compelling reason under the facts of his case.

While the Court is sympathetic to Graham's concerns about the possibility of contracting COVID-19, such concerns have no bearing, much less "material bearing," under § 3142(f), on the question of Defendant's risk of flight and the safety of the community, under these facts. *See United States v. Jones*, No. 1:17-cr-00582-CCb-2, 2020 WL 1323109, at *1 (D. Md. Mar. 20, 2020) (denying motion for release of detainee exposed to COVID-19 at another detention facility, despite detainee's underlying health issues including pregnancy, because such considerations were not the sole determinant of whether detention was appropriate under § 3142(g) factors); *United States v. Martin*, No. PWG-19-140-13, 2020 WL 1274857, at *4 (D. Md. Mar. 17, 2020) (denying relief under § 3142(f), finding that COVID-19 pandemic did not constitute information material to the question of defendant's particular risk to the public).

In July 2019, applying the factors of § 3142(g), including the nature of the instant charges as well as Graham's previous kidnapping and aggravated robbery offenses, Magistrate Judge Rau found that Graham failed to rebut the presumption in favor of detention. (Order of Detention at 3.) Moreover, even if Graham had rebutted the presumption, the magistrate judge still found that the Government had shown that no conditions of release would assure the safety of the community or assure Graham's appearance in court. (*Id.*) Graham offers no explanation for how his concerns about contracting COVID-19 impact the Court's prior determination about his risk of flight and

the safety of the community. Accordingly, there is no basis for reopening the detention hearing under § 3142(f). No hearing is warranted.

Nor does Defendant's concern about the pandemic constitute an exceptional reason warranting release under § 3145(c), or make temporary release "necessary" under § 3142(i). Defendant's concern is too generalized and speculative in nature, as he simply states, (Def.'s Mot. at 1), "I . . . am requesting that the above entitled Court reconsiders one's release based on the epidemic of the deadly plague (COVID-19) that has claimed thousands, if not tens of thousand[s] of human beings' lives around the World." *See United States v. Winchester*, No. 18-cr-301(1), 2020 WL 1515683, at \*5 (M.D.N.C. Mar. 30, 2020) (denying request for release in wake of COVID-19 pandemic, and finding that the defendant failed to address the circumstances at the facility in which he was detained, and instead extrapolated "from far-flung situations in the broadest of broad-brush strokes[.]").

To the extent that Graham is slightly more specific, citing the "traffic of incoming/outgoing men/women" at the jail as "constant," (Def.'s Mot. at 1), his concerns are rebutted by the Frank Affidavit. As set forth in the Frank Affidavit, the Jail has provided detailed information about the significant steps it has undertaken to prevent and mitigate the risks posed by COVID-19 to inmates' health and safety. As noted, the Jail quarantines and monitors incoming detainees for a 14-day period, and provides screening and medical care to any current inmates who exhibit signs or symptoms of illness. Moreover, the Jail is operating with only essential staff, who are screened and monitored for COVID-19 daily. As of this writing, those steps appear to be successful, as there have been no reported incidents of COVID-19 within the Sherburne County Jail. *See United*

*States v. Blegen*, No. 19-cr-304 (SRN/TNL), (D. Minn. April 2, 2020 Order [Doc. No. 87] at 10) (noting absence of reported cases in Sherburne County Jail); *United States v. Morris*, No. 17-cr-107(01) (DWF/TNL), 2020 WL 1471683, at *4  (D. Minn. Mar. 26, 2020) (noting, as of March 26, 2020, "zero reported cases of COVID-19 in the jail."); *see also United States v. Hamilton*, No. 19-cr-54-01 (NGG), 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020) (stating, "perhaps most importantly, as of this writing, there have been no reported incidents of COVID-19 within [defendant's detention facility], and the Bureau of Prisons is taking system-wide precautions to mitigate the possibility of infection within its facilities.  As such, given the risks that [defendant's] release would pose, the court concludes that the possibility of an outbreak at [his detention facility] is not a 'compelling circumstance' justifying his release."). In addition, the physical structure and airflow arrangements of the Jail are designed to protect inmates, and have been enhanced to provide even greater measures of protection.

Furthermore, Graham does not represent that he has a medical condition that places him at greater risk with respect to COVID-19 than the rest of the population.  *See United States v. Sanders*, No. 19-20037-01-DDC, 2020 WL 1528621, at *4 (D. Kan. Mar. 31, 2020) (noting that the defendant has no elevated personal risk factors for COVID-19, and may actually be at greater risk outside the prison).  The risk created by the pandemic is not unique to Defendant, and exists in society at large.  *See, e.g., United States v. West*, No. 20-MJ-5073 TLF, 2020 WL 1550624, at *3 (W.D. Wash. Apr. 1, 2020) (noting that risk of exposure to COVID-19  applies to "any person in our community at this time"); *United States v. Kerr*, No. 18-cr-296-L, 2020 WL 1529180, at *3 (N.D. Tex. Mar. 31, 2020)

(stating that fear of COVID-19 outbreak is not unique to the defendant in particular, and is not an "exceptional circumstance."); *United States v. Cornish*, No. 20-cr-3-GFVT-MAS, ___ F. Supp. 3d ___, 2020 WL 1498841, at *5 (E.D. Ky. Mar. 30, 2020) (finding that because COVID-19 is prevalent in the community at large, any difference in health risks to detained population was minimal); *United States v. Jackson*, No. 18-cr-216, 2020 WL 1445958, at *2 (W.D. Pa. Mar. 24, 2020) (finding it speculative to presume that COVID-19 was present or imminent in jail, and noting that potential exposure exists anywhere in the wider community).

As to any argument that Graham's continued confinement violates the Eighth Amendment's prohibition against cruel and unusual punishment, (*see* Def.'s Mot. at 1), the Court disagrees. Given all of the bases for Graham's detention and no evidence that the Jail is unable to effectively monitor or treat him should he contract COVID-19, along with a lack of evidence showing that Graham is at higher risk of contracting COVID-19 in general, or a higher risk while in custody than if he were released, the Court finds no evidence of deliberate indifference to his medical needs in violation of the Eighth Amendment. *See United States v. McDonald*, No. 2:19-cr-00312-KJD-VCF, 2020 WL 1659937, at *3 (D. Nev. April 3, 2020) (finding no Eighth Amendment basis for temporary release under § 3142(i), in light of grounds for detention, no evidence that the place of confinement is unable to treat the defendant, and lack of evidence that defendant is at higher risk of contracting COVID-19 in custody than if he were released). Likewise, the Court rejects Graham's claim that his continued confinement violates his rights to due process under the Fifth and Fourteenth Amendments. (*See* Def.'s Mot. at 2.) Graham's detention

is reasonably related to the legitimate government interest of protecting the public and guaranteeing his appearance at trial, and he has not shown that COVID-19 alters that determination. *McDonald*, 2020 WL 1659937, at *3 (rejecting due process challenge based on COVID-19 to continued detention and finding detention was reasonably related to legitimate government interests).

In sum, Defendant's concerns concerning COVID-19 do not constitute a compelling reason under § 3142(i) for temporary release, a material change in circumstance under § 3142(f) to warrant the reopening of the detention hearing, or an "exceptional reason" under § 3145(c) to justify his release from the Sherburne County Jail. *See Blegen*, No. 19-cr-304 (SRN/TNL), (D. Minn. April 2, 2020 Order at 9–11) (finding COVID-19 pandemic did not create exceptional reason for release from Sherburne County Jail); *Morris*, 2020 WL 1471683, at *4 (finding, as to a defendant housed in the Sherburne County Jail who cited age and poor health, that COVID-19 pandemic did not constitute an exceptional reason for release); *United States v. Quijada*, No. 19-cr-276 (DSD/TNL), (D. Minn. Mar. 20, 2020 [Doc. No. 32]) (finding COVID-19 pandemic was not an exceptional reason warranting release from Sherburne County Jail). Nor has Graham demonstrated that his continued detention presents a constitutional violation. *See McDonald*, 2020 WL 1659937, at *3 (rejecting defendant's constitutional arguments for temporary release in light of COVID-19.)

**B. Various Letters and/or Motions Related to the Instant Motion**

As noted, Graham has filed several letters or motions seeking similar or additional relief [Doc. Nos. 133, 158, 161, 167, 170]. The Court briefly addresses these requests, as well as arguments Graham presents in his Reply, unrelated to detention.

### 1. February 11, 2020[1] Motion [Doc. No. 133]

In his February 11, 2020 motion, Graham asserts various "Sovereign Citizen" arguments concerning the authority of the Government and the Court.[2] (Feb. 11, 2020

---

[1] Because Graham is self-represented, his filings are mailed to the Court, and docketed by the Clerk of Court. The dates referenced here are the dates on which the Clerk's Office docketed his submissions, and not the dates on which they were drafted or mailed.

[2] As noted elsewhere in this case, Graham maintains "Sovereign Citizen" beliefs. Magistrate Judge Katherine Menendez has explained that

> [t]he "Sovereign Citizens" movement is based on a theory where [Sovereign Citizens] view the "USG [U.S. Government] as bankrupt and without tangible assets; therefore, the USG is believed to use citizens to back U.S. currency. Sovereign citizens believe the USG operates solely on a credit system using American citizens as collateral." *El v. AmeriCredit Fin. Servs., Inc.*, 710 F.3d 748, 750 (7th Cir. 2013) (citation omitted); *see also Cooper v. United States*, 104 Fed. Cl. 306, 313–314 (2012) (explaining that "an individual who identifies with the Sovereign Citizen Movement considers himself to be his own sovereign, not a United States citizen, and therefore 'believe[s] that [he is] not subject to government authority.' *Gravatt v. United States*, 100 Fed. Cl. 279, 282 (2011). Members of this movement think that [t]he federal government . . . has tricked the populace into becoming U.S. citizens by entering into 'contracts' embodied in such documents as birth certificates and social security cards. With these contracts, an individual unwittingly creates a fictitious entity (i.e., the U.S. citizen) that represents, but is separate from, the real person. Through these contracts, individuals also unknowingly pledge themselves and their property, through their newly created fictitious entities, as security for the national debt in exchange for the benefits of citizenship."); *Sochia v. Federal–Republic's Cent. Gov't*, 2006 WL 3372509, at *5 (W.D. Tex. Nov.

Mot. at 1–3.)  For example, he argues that his former counsel's actions in entering a not-guilty plea on his behalf were "fraudulent," the Government has not produced a proper "true bill," and he challenges governmental and judicial immunity, although such immunity is not implicated in the instant criminal proceedings.  (*Id.* at 1–2.)  Graham unsuccessfully raised these Sovereign Citizen arguments before the magistrate judge, who rejected them.  (*See* Feb. 10, 2020 Order [Doc. No. 130].)  Graham appealed those rulings to the undersigned judge, who affirmed them.  (Feb. 27, 2020 Order [Doc. No. 141].)  Graham argues that the remedy for these alleged violations is release from detention.  (Feb. 11, 2020 Mot. at 3.)  Because the Court has ruled on these issues and has denied Graham's request for release, this motion is denied as moot.

## 2.  March 13, 2020 "Rebuttal" [Doc. No. 158]

In this document, Graham "rebuts" the Court's February 27, 2020 Order that affirmed Magistrate Judge Menendez's February 10, 2020 Order, as well as the February 28, 2020 Trial Notice [Doc. No. 148].  He reasserts his request for a hearing.  (Mar. 13, 2020 Rebuttal at 1–3.)  Again, the Court has ruled on the issues addressed in the February 10, 2020 Order.  No hearing was necessary.  To the extent that Graham seeks to raise new issues on which the Court has not previously ruled, he may do so at such time when the

---

20, 2006) (collecting cases and describing plaintiff's "sovereign citizen" theories as "frivolous" and "rejected by every federal court that has considered them").

(Feb. 10, 2020 Order [Doc. No. 130] at 4 n.1.)

Court and parties convene for his pretrial conference. The Court denies as moot the requests in Graham's March 13, 2020 Rebuttal.

### 3. March 16, 2020 "Letter to Communicate with Chief Judge John R. Tunheim" [Doc. No. 161]

Graham asserts various Sovereign Citizen issues in his March 16, 2020 "Letter to Communicate with Chief Judge John R. Tunheim." He requests that the undersigned judge, "et al.," "produce their oath of office on the record in open court." (Mar. 16, 2020 Letter at 3.) He likewise asserts that probable cause has not been established in this case. (*Id.*) Again, Magistrate Judge Menendez addressed such issues, including whether probable cause supports the charges and detention, in her February 10, 2020 Order, and her reasoning likewise applies to any Sovereign Citizen issue newly asserted in the March 16 letter. (Feb. 10, 2020 Order at 3–5.) As the Court has ruled on these issues, the requests in the March 16, 2020 letter are denied as moot.

### 4. March 23, 2020 Letter to U.S. Marshal [Doc. No. 167]

In a document filed the same day as the instant motion for release, Graham submitted a letter to the U.S. Marshal regarding his "arbitrary detainment." (Mar. 23, 2020 Letter to Marshal.) In this letter, Graham protests his detention, which he finds lacking in probable cause, and he challenges the alleged deprivation of his property. (*Id.* at 1–2.) He appears to seek a hearing to address his detention, claims that the Court lacks subject matter and personal jurisdiction over him, and requests that the U.S. Marshal subpoena the Court "to have them answer these issues [concerning detention]," and, if that is not impossible, release him. (*Id.* at 3.)

To the extent that Graham seeks release from detention and a hearing on the same, because the Court has denied such relief in response to his Motion for Release, the relief requested in the March 23, 2020 Letter is therefore denied as moot. As for whether probable cause supports the charges, Mr. Graham previously raised this argument before the magistrate judge, who rejected it. (*See* Feb. 10, 2020 Order.) Likewise, to the extent that Graham challenges this Court's jurisdiction or authority, the magistrate judge addressed the same or similar Sovereign Citizen arguments in the same order. (*Id.* at 4–6.) Again, Graham appealed those rulings to the undersigned judge, who affirmed them. (Feb. 27, 2020 Order at 2.) Accordingly, because the Court has ruled on these issues, the relief requested in the March 23, 2020 Letter to the U.S. Marshal is denied as moot.

### 5.  March 24, 2020 Letter [Doc. No. 170]

In a letter filed on March 24, 2020, directed to the Clerk of Court, Graham again expresses concerns about the COVID-19 pandemic. (Mar. 24, 2020 Letter at 1.) Without providing any detail, Graham asserts that his rights to due process and equal protection are at stake, as well as the right to be free from cruel and unusual punishment. (*Id.* at 2.) As for relief, Graham requests that the Clerk of Court docket Chief Judge Tunheim's General Order of March 13, 2020, as well as certain correspondence that he attached to his March 24 letter. (*See* Doc. No. 170-1.)

The Clerk's Office docketed the March 24 letter and the attachments. Accordingly, as these materials have been docketed, Graham's request for relief in the March 24, 2020 Letter is denied as moot. To the extent that Graham considers his continued detention to

constitute an Eighth Amendment violation, the Court also denies this portion of the request as moot, for the reasons stated with respect to his Motion for Release.

### 6. Additional Arguments Raised in Defendant's Reply [Doc. No. 178]

In his Reply to the instant motion, Graham raises issues beyond his request for release from detention. These additional arguments are: (1) again, former counsel's entry of a guilty plea on his behalf was purportedly "fraudulent," and Graham's request to withdraw the not-guilty plea was "denied and arbitrarily ignored," (Reply at 2); (2) he challenges the transfer of this action from state to federal court, stating that there is no warrant showing probable cause, nor a writ of habeas corpus allowing his transfer, (*id.*); and (3) he challenges the authority of an Assistant U.S. Attorney to sign an indictment, and questions the grand jury's finding of probable cause. (*Id.* at 3–4.)

The magistrate judge previously rejected Graham's claim that his not-guilty plea was fraudulent, as well as the related question of whether he could therefore withdraw it. (Feb. 10, 2020 Order at 6.) On the latter point, Magistrate Judge Menendez held that absent a statement from Graham that he wished to plead guilty, his request to withdraw his not-guilty plea would be denied. (*Id.*) This Court affirmed those rulings. (Feb. 27, 2020 Order.) Graham's arguments about a lack of probable cause and the general authority of the courts or the justice system were likewise addressed in the February 10, 2020 Order, which the Court affirmed. (Feb. 10, 2020 Order at 4–6; Feb. 27, 2020 Order at 141.) Accordingly, any relief requested in Defendant's Reply that is outside the scope of detention is denied as moot.

### III.    CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that:

1.    Graham's Motion for Reconsideration of Detention Denial/Release [Doc. No. 166] is

     **DENIED**; and

2.   His requests for relief in Doc. Nos. 133, 158, 161, 167, 170 are **DENIED as moot**.

Dated: April 7, 2020

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Judge
